UNTIED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID ENGINEERING COMPANY,
L.L.C.,

        Plaintiff,                    CASE NO. 11-12615

v.                                      HON. MARIANNE O. BATTANI

MORBERN INC.,

        Defendant.
_____/

OPINION AND ORDER
**GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

This matter is before the Court on Defendant Morbern, Inc.'s Motion for Partial Summary Judgment Regarding Plaintiff's Claims for Post-Termination Commissions. (Doc. 25). The Court heard oral argument on July 25, 2012, and at the conclusion of the hearing took the motion under advisement. For the reasons that follow, the Court **GRANTS** Defendant's motion.

I.    STATEMENT OF FACTS

    A.    The Parties

Plaintiff David Engineering Company, L.L.C., is a Michigan limited liability company located in Rochester Hills, Michigan. David Calder solely owns and operates David Engineering. Defendant Morbern, Inc., is a Canadian corporation having its principal place of business located in Cornwall, Ontario. Defendant manufactures vinyl seating products for the automotive industry.

**B.     The Sales Agency Agreement**

In the spring of 2009, John Weaver, Defendant's Vice President of Sales, asked Plaintiff to serve as Defendant's sales representative to the automotive industry in Southeastern Michigan. At the time, Defendant had very limited exposure in this industry. Weaver sought out Plaintiff for Calder's decades of experience and network of sales contacts. The primary purpose of this engagement was for Plaintiff to generate business for Defendant in Southeastern Michigan, and in particular, to procure business from the seating divisions of Lear and General Motors.

In April 2009, the parties negotiated a written Sales Agency Agreement (the "Agreement"). Plaintiff admits it had an opportunity to review and make changes to this Agreement. (Doc. 25 Ex. F at p. 46). Under the Agreement, which contains an Ontario choice of law clause, Defendant was to pay Plaintiff sales commissions of 5% on first $5 million of sales per contract year, 4% on the next $5 million of sales per contract year, and 3% on all sales in excess of $10 million per contract year. (Doc. 25 Ex. B at p. 1). With respect to post-termination commissions, the Agreement states: "If this agreement is terminated by either party, [Defendant] will pay [Plaintiff] commission for life of the program blanket purchase orders acquired by [Plaintiff] while working on behalf of [Defendant]." (Doc. 25 Ex. B at p. 1). The Agreement also contains the following integration clause: "The parties furthermore acknowledge and covenant that the provisions of this agreement have been freely and fully discussed and negotiated and that the execution of this agreement constitutes and is deemed to constitute full and final proof of the foregoing statement." (Doc. 25 Ex. B at p. 3).

In October 2010, Defendant proposed a new sales agency agreement to reduce Plaintiff's commission rate to 4% on first $5 million of sales per contract year, 3% on the next $5 million of sales per contract year, and 2.5% on all sales in excess of $10 million per contract year. (Doc. 27 at p. 3). The parties dispute whether Plaintiff agreed to the 2010 agreement. This dispute is not relevant for purposes of the present motion, however, since the 2010 agreement contains identical post-termination commissions and integration clause language. (Compare Doc. 25 Ex. B with Ex. C).

### C.     Defendant's Business with Lear

While Plaintiff was under contract to act as Defendant's sales agent, Defendant received four purchase orders from Lear. The parties dispute whether Plaintiff "acquired" that business for Defendant under the Agreement. Notwithstanding that conflict, Defendant apparently assumes for the purposes of the present motion that Plaintiff "acquired" the Lear business for Defendant (thereby triggering its duty to pay Plaintiff a sales commission), but disputes whether the four Lear purchase orders are "blanket" purchase orders that fall within the post-termination commissions clause of the Agreement. The Court reviews the details Defendant's business relationship with Lear to put this dispute in context.

In mid-May 2009, Mark Hikra, Lear's Vice President of Global Marketing, sent Weaver a Request For Quotation to supply its 57-inch WN1J product to General Motors. (Doc. 25 Ex. E at p. 24; Ex. G). This WN1J product was to be used as part of the General Motors GMT900 program for automobiles, such as the GMC Suburban, Cadillac Escalade, and Chevrolet Tahoe. Defendant sent Lear a price quote. (Doc. 25

Ex. F at pp. 51-53). Lear selected Defendant's quote after reviewing multiple bids from a variety of suppliers. (Id.).

Before Lear could issue purchase orders to Defendant for the WN1J product, Lear and Defendant had to first negotiate and sign a Lear Supply Agreement ("LSA"). An LSA sets forth the terms and conditions for all purchase orders of a particular part or program during the life of the LSA. Plaintiff admits the LSA is not itself, a purchase order. (Doc 25. Ex. F at pp. 122-123).[1] Rather, the LSA acts as the contract under which Lear issues purchase orders to its suppliers. (Doc. 25 Ex. F at p. 38).

Lear and Defendant executed a LSA in June 2010 (the "2010 LSA") for the WN1J products. (Doc. 25 Ex. I). The 2010 LSA provides: "Subject to approvals by the OEM and Lear, [Defendant] agrees that it will sell to Lear and Lear agrees to buy from [Defendant] all of Lear's requirements for the [WN1J products] at the price set forth below or as revised pursuant to the explicit provisions of this LSA." (Id. at p. 2). The 2010 LSA incorporates Lear's General Terms and Conditions by reference. (Id. at p. 1).

One year later, Defendant entered into a replacement LSA with Lear (the "2011 LSA"). (Doc. 25 Ex. J). The 2011 LSA was executed in response to Lear's demands for a price concession. Like the 2010 LSA, the 2011 LSA designates Defendant as its exclusive supplier of WN1J requirements, and the 2011 LSA again incorporated Lear's Terms and Conditions by reference. (Id. at p. 1).

Lear ultimately issued to Defendant four production purchase orders for WN1J products. Two of these purchase orders arose under the 2010 LSA, (Doc. 25 Ex. L;

---

[1] The Court notes that in early declarations, Weaver and Mark Bloomfield, Defendant's CEO, described an LSA as a "blanket purchase order." See (Doc. 15 Ex. A at ¶ 8; Doc. 25 Ex. H at ¶ 9). During Weaver's later deposition, however, he stated that this part of his declaration was incorrect. (Doc. 25 Ex. E at pp. 30-31).

4

Ex. M) and two under the 2011 LSA, (Doc. 25 Ex. N; Ex. O). As with the LSAs, each purchase order incorporated Lear's Terms and Conditions by reference.

Relevant to the instant dispute, Lear's Terms and Conditions define three types of purchase orders:

> K. Order. Each Order is either a Spot-buy Order, a Blanket Order or a requirements contract Order depending on the quantity and duration specified on the face of the Order. A Spot-buy Order is a one-time Order for a specific quantity of Goods. A Blanket Order is an Order for Goods in accordance with the firm quantities and delivery schedules specified in Releases issued by Purchaser pursuant to the Order. A requirements contract Order is an Order for all or a designated portion of Purchaser's requirements for Goods for a specified period of time in accordance with the firm quantities and delivery schedules specified in Releases issued by Purchaser pursuant to the Order.

(Doc. 25 Ex. P at p. 3). Plaintiff admits that Lear's Terms and Conditions differentiate between a "spot-buy" order, "blanket" order, and "requirements" order. (Doc. 25 Ex. F at pp. 92-95).

Additionally, the October 6, 2010 and January 20, 2011 purchase orders expressly state, in bold, on the first page of the order that:

> Seller agrees that it will sell to Lear and Lear agrees to buy from Seller all of Lear's requirements for the products covered by this Purchase Order or Purchase Order amendment from Issue Date through [DATE] at the prices indicated on this Purchase Order or Purchase Order amendment in accordance with the firm quantities and delivery schedules specified in releases.

(Doc. 25 Ex. L; Ex. M). Although July 18, 2011 and July 27, 2011 purchase orders do not contain the above quoted language, the "Requirement/Blanket" designation box on the first page of the document indicates that it is a "requirements" contract under the Lear Terms and Conditions. (Doc. 25 Ex. N; Ex. O). Plaintiff does not dispute that each

5

of the four purchase orders in this case are designated on their face as "requirements" purchase orders. (Doc. 25 Ex. F at p. 92).

### D. The Parties End Their Sales Agency Relationship

In May 2011, while Defendant was negotiating the 2011 LSA, it notified Plaintiff that its commission rate would be further reduced to a flat 1% on all sales beginning with the June 2011 commission payment; Plaintiff objected and refused to agree to the second attempted reduction in his commission. On May 31, 2011, Defendant informed Plaintiff that it was terminating the parties' relationship effective immediately. (Doc. 27 Ex. F).

### E. Procedural History

Plaintiff filed suit against Defendant for unpaid commissions on June 16, 2011. (Doc. 1). Plaintiff's First Amended Complaint includes three counts: (1) breach of contract seeking damages for unpaid sales commissions; (2) declaratory judgment concerning Defendant's liability for continuing post-termination sales commissions; and (3) a claim for penalty damages and attorney fees under Mich. Comp. Laws § 600.2961, Michigan's Sales Representatives Commission Act. (Doc. 9).

On February 7, 2012, the Court enforced the Ontario choice of law provision in the Agreement and dismissed Count III by granting Defendant's motion for partial summary judgment. (Doc. 23).

On April 30, 2012, Defendant filed another motion for partial summary judgment, this time seeking an order that Plaintiff is not entitled to post-termination commissions under Counts I and II of its First Amended Complaint. (Doc. 25).

## II. STANDARD OF REVIEW

Summary judgment is appropriate only when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, (1986). Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Id., 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). The Court "must lend credence" to the non-moving party's interpretation of the disputed facts. Marvin v. City of Taylor, 509 F.3d 234, 238 (6th Cir. 2007) (citing Scott v. Harris, 127 S.Ct. 1769, 1775 (2007)). The non-moving party may not rest upon its mere allegations, but rather must set out specific facts showing a genuine issue for trial. See Fed.R.Civ.P. 56(c)(1). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. Hopson v.DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002).

## III.    ANALYSIS

The parties dispute whether the four Lear purchase orders at issue are "blanket purchase orders" that fall within the post-termination commissions provisions of their Agreement.  To resolve this dispute, the Court must interpret the term "blanket purchase orders" and then determine whether the Lear purchase orders fall within that definition.  In light of the operative choice of law clause, the Court applies the contract interpretation principles of Ontario law.

A court ascertains the intent of contracting parties based on "the plain meaning of the words the parties chose to express the terms of their agreement."  Bird Constr. Co. v. Sault Ste. Marie Pub. Utils. Comm'n, 1997 CanLII 681, at *5 (Can. Ont. C.A.).  If the contract is clear and unambiguous, the court must enforce it as written and may not consider extrinsic evidence of contractual intent.  See Sigma Ajax Inc. v. Belovich, 2008 O.N.C.A. 445 (Can. Ont. C.A.); Eli Lilly & Co. v. Novopharm Ltd., [1998] 2 S.C.R. 129 (Can.) at para. 57-60; see also Northland Power v. Kvaerner Hydro Power, Inc., 238 F.3d 423 (6th Cir. 2000) (Table) ("Ontario law provides that, if the language of a written contract is clear and unambiguous, no extrinsic parol evidence may be admitted to alter, vary, or interpret the words used in the writing.").  To determine whether a written contract is ambiguous under Ontario law, a court interprets the words of the contract according to their "plain and ordinary meaning."  Id. (citations omitted).

Defendant claims the term "blanket purchase orders" is plain and unambiguous.  It does not, however, provide the plain and unambiguous meaning of that term.  Instead, it offers Lear's Terms and Conditions to show that the four purchase orders are not "blanket purchase orders" as Lear defines that term.  Lear's definition of "blanket

8

purchase orders" is irrelevant. The proper inquiry is what Plaintiff and Defendant intended the term "blanket purchase orders" to mean in their Agreement.

Recognizing Defendant's failure to proffer a relevant definition of "blanket purchase orders," Plaintiff advances a "plain" and "commonly understood" meaning of that term from Black's Law: "An order negotiated by a customer with a supplier for multiple purchases and deliveries of specified goods over a stated period, as an alternative to placing a separate order for each transaction." BLACK'S LAW DICTIONARY (9th ed. 2009). Defendant does not object to Plaintiff's use of a legal dictionary to define "blanket purchase orders" and under Ontario law, the Court may refer to dictionary definitions when determining the meaning of a disputed term or phrase in a contract. See Cote v. JDR Coachworks & Fabrication, 2005 CanLII 6374 (ON SC) at para. 16. The Court finds no reason to reject Defendant's concession and therefore defines the term "blanket purchase orders" as Plaintiff requests under Black's Law.

Before considering the question of whether the four Lear purchase orders are "blanket purchase orders" under the parties' Agreement, the Court notes Defendant has highlighted a dispositive difference between a "blanket purchase order" and a "requirements contract," the latter not covered under the post-termination commissions provision. Comparing Plaintiff's definition of "blanket purchase order" with the Black's Law definition of a "requirements contract," which is "a contract in which a buyer promises to buy and a seller to supply all the goods . . . that a buyer needs during a specified period," BLACK'S LAW DICTIONARY (9th ed. 2009), Defendant identifies the critical distinction between the two types of purchasing agreements: under a "blanket purchase order" a buyer orders a specified number of goods whereas under a

9

"requirements contract," a buyer agrees to purchase all the goods it requires from a specific seller. In other words, "blanket purchase orders" are not synonymous with "requirements contracts" because of the difference in the quantity term. Relatedly, Canadian courts recognize a requirements contract as a unique type of contract which binds a purchaser to buying all of its requirements for a particular part from a single supplier. See Coast Hotels Ltd. v. Royal Doulton Can. Ltd., 2000 B.C.S.C. 857, at para. 28.

After reviewing each of the four Lear Purchase Orders at issue, the Court finds that they are not "blanket purchase orders" that fall within the post-termination commissions provision. Here, the October 6, 2010 and January 20, 2011 purchase orders expressly state: "Seller agrees that it will sell to Lear and Lear agrees to buy from Seller all of Lear's requirements for the products covered by this Purchase Order . . . ." (Doc. 25 Ex. L; Ex. M). This language describes a requirements contract, not a "blanket purchase order." Although the July 18, 2011 and July 27, 2011 purchase orders do not contain this language, the "Requirement/Blanket" designation box indicates that Lear has defined it as a "requirements contract Order" contract, (Doc. 25 Ex. N; Ex. O), and Lear's definition of a "requirements contract Order" closely aligns with the Black's Law definition of "requirements contract," (Id. Ex. P at p. 3). Additionally, Plaintiff has admitted that he was familiar with Lear's Terms and Conditions and that Lear designated all four of its purchase orders at issue here as "requirements" orders. (Doc. 25 Ex. F at pp. 92-95). Accordingly, these purchase orders are not "blanket purchase orders" that fall within the post-termination commissions provision of the parties' Agreement.

The Court rejects Plaintiff's attempt to introduce parol evidence to alter this conclusion. In this regard, Plaintiff offers the deposition testimony of Weaver and Calder to show that the parties subjectively believed that a "blanket purchase order" had the same definition as a requirements contract. The Court cannot consider this extrinsic evidence because the Agreement is plain, unambiguous, and fully integrated. See Sigma Ajax, 2008 O.N.C.A. 445; Eli Lilly & Co., 2 S.C.R. 129 at paras. 57-60; Northland Power, 238 F.3d at 423. The language of the post-termination commissions provision is clear: it applies only to "blanket purchase orders." As discussed above, requirements contracts do not fall within the commonly understood meaning of "blanket purchase orders" and the Lear purchase orders are requirements contracts. The Court also disagrees with Plaintiff's suggestion that a requirements contract is a "subset" of a "blanket purchase order." Plaintiff offers no support for this assertion, and the separate entries for these terms in Black's Law strongly suggest otherwise. If the parties had intended for "blanket purchase orders" to include requirements contracts, they should have included such language in the negotiated Agreement. They did not.

The Court also rejects Plaintiff's argument that Defendant's Answer creates a genuine issue of material fact as to whether the Lear purchase orders are "blanket purchase orders" under the post-termination commissions provision. Plaintiff builds this argument around Defendant's Answer to Paragraph 14 of Plaintiff's First Amended Complaint, which reads:

> [Plaintiff's First Amended Complaint]
>
> 14. Defendant has indicated to the Plaintiff that it has no intentions of paying life of part commissions to the Plaintiff or to otherwise comply with its contractual obligations under the Sales Agency Agreement. (Doc. 9 at ¶ 14).

11

>   [Defendant's Answer]
>
>   14. [Defendant] denies the allegations contained in paragraph 14. Answering further, [Defendant] denies that the 2010 agreement provides for "life of the part" post-termination commissions. Rather, the post-termination commissions are payable only for "life of the program blanket purchase orders acquired" by Plaintiff. Since Plaintiff did not acquire the current blanket purchase order at issue, no post-termination commissions are owed. (Doc. 12 at ¶ 14).

Plaintiff claims that since Defendant described the Lear purchase orders as "blanket purchase orders," there exists a genuine issue of material fact as to whether these purchase orders are "blanket purchase orders" as that term is used the post-termination commissions provision. The Court disagrees.

Defendant's passing reference to a "blanket purchase order" at such an early stage in the proceedings does not equate to an acknowledgement that the Lear purchase orders at issue are "blanket purchase orders" under the post-termination commissions provision, nor does it prevent Defendant from challenging Plaintiff's interpretation of that term with a motion for summary judgment. Accordingly, Defendant's Answer to Plaintiff's Paragraph 14 does not create a genuine issue of material fact as to whether the Lear purchase orders are "blanket purchase orders" under the parties' Agreement.

## IV.   CONCLUSION

For the reasons stated above, Defendant's motion (Doc. 25) is **GRANTED**.

**IT IS SO ORDERED.**

>   s/Marianne O. Battani
>   MARIANNE O. BATTANI
>   UNITED STATES DISTRICT JUDGE

DATE:  July 31, 2012

## CERTIFICATE OF SERVICE

I hereby certify that on the above date a copy of this Opinion and Order was served upon all parties of record via the Court's ECF Filing System.

s/Bernadette M. Thebolt
Case Manager
